IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

STEVEN CRUMP,

      Plaintiff,

      v.                            CASE NO.  24-3036-JWL

UNIFIED GOVERNMENT
OF JOHNSON COUNTY, et al.,

      Defendants.

## MEMORANDUM AND ORDER
## TO SHOW CAUSE

Plaintiff brings this pro se case under 42 U.S.C. § 1983.  He is currently detained at the Johnson County Adult Detention Center ("JCADC") in New Century, Kansas.

The Court entered a Memorandum and Order (Doc. 7) ("M&O") on April 10, 2024, giving Plaintiff an opportunity to show good cause why his claims against collective defendants, supervisory defendants, and municipalities should not be dismissed.  The M&O also found that the proper processing of Plaintiff's medical, retaliation, and ADA claims could not be achieved without additional information from appropriate officials of the JCADC.  *See Martinez v. Aaron*, 570 F.2d 317 (10th Cir. 1978); *see also Hall v. Bellmon*, 935 F.2d 1106 (10th Cir. 1991).  The Court ordered JCADC officials to prepare and file a *Martinez* Report, stating that "[o]nce the report has been received, the Court can properly screen Plaintiff's claims under 28 U.S.C. § 1915A." (Doc. 7, at 13.)   The *Martinez* Report (Docs. 26, 27, and 30) (the "Report") has now been filed, and Plaintiff's Complaint is before the Court for screening in light of the Report.  The Court's screening standards are set forth in the MOSC.

## I.  Nature of the Matter before the Court

Plaintiff alleges that the defendants were deliberately indifferent to his injuries and disabilities, which resulted in further injury.  (Doc. 1, at 2.)  Plaintiff states that he arrived at the JCADC from the hospital on July 5, 2023, after suffering injuries during his arrest the day before. He alleges that he had been shot in the spine with a "less-lethal projectile," tased in the back of the head and on his shoulder, repeatedly bitten by a police dog, and had an ankle injury.  *Id.*  at 6. Upon his intake to JCADC, he was provided with a wheelchair.  *Id*. at 6.  He was placed in isolation under observation.  He expressed repeated complaints about the 24-hour lockdown he experienced in isolation, and he demanded the use of a phone.  *Id*.  In retaliation for his complaints, Plaintiff alleges that a deputy was sent to his cell to remove his wheelchair on July 10, 2023.  *Id.* at 7.  At that point, Plaintiff claims that he had not been examined by a doctor.  *Id.*  He was suffering from dizzy spells, vertigo, the bottoms of his feet were badly blistered, the tendon and ligaments were detached from his ankle bone, he had 10 staples in the back of his left leg, the front of his left leg was shredded from dog bites, and he had a spine contusion.  *Id.*  Plaintiff asserts that he could not stand without extreme pain.  *Id.* at 8.  Plaintiff states that he was given "extreme amounts of [pain] medication," but he was denied the use of an accessible shower, back brace, extra mattress, and walking cane.  *Id.* at 8-9.   In addition, he claims that he was denied an MRI and further testing on his back injury.  *Id.* at 3.  However, he later states that he had a CT scan on September 5, 2023. *Id*. at 11.

At some point, Plaintiff was moved to a different cell.  He alleges that the cell had molded food caked over the desk, urine and feces stains on the toilet, a soiled mattress, black growth on the walls, and debris on the floor.  *Id.* at 9.  When Plaintiff complained, he was told that he could clean the cell himself.  However, he was immobilized and bedridden.  *Id.* at 9-10.

Plaintiff alleges that he had to "drag his broken body down to Medical" each day to have the bandage on his leg changed. *Id.* at 10. He was given just enough pain medication to make it out of his cell for food and Medical, but the rest of the time he lay on the soiled, hard mattress in excruciating pain. *Id.* His leg began to rot. The infection became so severe that Plaintiff lost all feeling in his left leg. *Id.* At some point, Medical had a specialist come to carve out all the rotting flesh. *Id.*

Plaintiff further states that he was denied a wheelchair or cane and forced to live in the filthy cell for five (5) months, until December of 2023. *Id.* at 15. He was unable to shower regularly during that time. *Id.* Further, Plaintiff alleges that he was verbally harassed by deputies working at the JCADC. *Id.* at 13.

The Complaint includes four counts. Count I alleges deliberate indifference to Plaintiff's health and safety in violation of the Fourteenth Amendment. *Id.* at 4. Count II alleges retaliation in violation of the First Amendment. *Id.* Count III alleges the management of the JCADC and various other supervisors should be held liable under *Monell*. *Id.* Count IV alleges violation of the Americans with Disabilities Act ("ADA"). *Id.* at 5.

Plaintiff names the following defendants: the Unified Government of Johnson County; the city of Olathe; the Johnson County Board of Commissioners; Sheriff Calvin Hayden; the JCADC health provider; the JCADC management; House Sergeants #1 and #2; the JCADC health administrator; Dr. Stanton; the JCADC Head Nurse; medical staff #1-8; Sheriff's Deputies #1-8; and policy makers #1-4. Plaintiff seeks relief in the form of full liability for physical and mental rehabilitation; over $6 million in compensatory damages; and over $8 million in punitive damages. *Id.* at 16.

## II.  The *Martinez* Report

JCADC officials filed a *Martinez* Report with more than 240 pages of exhibits attached. The exhibits are primarily Plaintiff's medical records.  The records do not support Plaintiff's account of his treatment at the JCADC.   Each of Plaintiff's primary contentions from the Complaint is addressed as follows:

### 1.  Wheelchair removed on 7/10/24 in retaliation for complaints even though Plaintiff still needed it.

Plaintiff was approved for a wheelchair upon intake on 7/5/23, for use until the blisters on the bottom of his feet were healed.  (Doc. 27-3, at 2; Doc. 27-12, at 1.)  He was scheduled for a review in 14 days.  (Doc. 27-12, at 1.)   On 7/8/23, RN Calloway noted during his wound treatment that the blisters were healed.  *Id*. at 2.  Plaintiff was asked by his module officer if he wished to return the wheelchair.  He told her that he would return it so that he could by removed from "Med Seg."  *Id*. at 3.  A chart review on 7/20/23 confirmed that wheelchair was not medically needed as the blisters were healed and Plaintiff had been walking independently to Medical.  *Id*. at 4.  The first complaint Plaintiff made about the removal of the wheelchair was received on 10/24/23.  *Id*. at 5.

### 2.  He had not been examined by a doctor when wheelchair removed.

Plaintiff was seen by a nurse on 7/5/23 for initial intake, then he was seen later that same day by an Advanced Practice Registered Nurse (APRN) for a full assessment.  (Doc. 27-1, at 1-8; Doc. 27-3, at 1-2.)  He was seen by a nurse on 7/11/23, 7/13/23, 7/14/23, and 7/15/23, and he was seen by an APRN on 7/12/23, 7/26/23, 7/31/23.  (Doc. 27-7; Doc. 27-8.)  He was seen by Dr. Stanton for the first time on 8/15/23.  (Doc. 27-9.)  In addition, he was seen by medical staff for wound care every day from 7/6/23 through 8/25/23, except for 8/23 and 8/24 when he refused care,

and by Wound Care Plus, LLC, an advanced mobile wound care specialist, on 8/1/23.  (Doc. 27-5; Doc. 27-10.)

**3. Tendon and ligaments were detached from his ankle bone.**

This concern was first noted on 11/22/23.  (Doc. 27-7, at 18.)  Plaintiff said the injury occurred at time of his arrest on 7/4/23.  There were x-rays taken of his left tibia and fibula on 7/5/23, with no fractures or indications of detached tendons or ligaments noted.  (Doc. 27-14, at 1.)

**4. He was given "extreme" amounts of pain medication.**

Plaintiff was initially prescribed ibuprofen 600 mg and Tylenol 650 mg.   (Doc. 27-3, at 2.)  On 7/12/23, this was increased to ibuprofen 800 mg and Tylenol 975 mg in response to Plaintiff's complaints of pain.  *Id.*  On 7/13/23, Plaintiff was asking for additional pain meds.  *Id.*  On 7/26/23, he was prescribed Flexeril 10 mg PRN x 3 days (a muscle relaxant).  On 8/18/24, the doctor added Meloxicam as needed for pain and extended Cyclobenzaprine for another 2 weeks.  (Doc. 27-4, at 1.)  On 11/7/23, the ibuprofen was discontinued, and Naproxen 500 mg bid prn was started.  (Doc. 27-9, at 3.)   The records show that Plaintiff refused his pain medication on 40 occasions.  (Doc. 27-16.)

**5. He was denied the use of an accessible shower, back brace, extra mattress, and walking cane.**

Plaintiff was officially granted the use of the handicapped shower on 9/1/23 (Doc. 27-31, at 4, 5) but had been allowed to use it prior to that date.  (*See* Doc. 27-31, at 1: "I use the handicapped shower because I need the railings. . . I have used the shower since I got out of my wheelchair.")  Plaintiff was allowed an extra blanket on 8/15/23 for pain management and positioning.  (Doc. 27-27, at 12.)  Plaintiff first requested a cane on 10/21/23.  (Doc. 27-27, at 1.)

Dr. Stanton initially denied the request but then approved the use of a cane on 11/7/23.  *Id.* at 5, 12.  He also ordered physical therapy on that date.  *Id.* at 14.  Plaintiff requested and was granted the use of a wheelchair for court appearances twice.  (Doc. 27-12, at 7, 8.)  There is no record of Plaintiff requesting a back brace.

**6.  He was denied "further testing" of his back injury.**

Plaintiff had lumbar and thoracic spine x-rays on 8/2/23.  (Doc. 27-14, at 2.)  The lumbar spine was again x-rayed on 8/18/23.  *Id.* at 3.  He had a CT scan on 9/5/23 which showed degenerative changes but no evidence of fracture or malalignment.  (Doc. 27-9, at 2.)  An MRI was ordered on 3/5/24.  *Id.* at 6.

**7.  His leg developed a severe infection and began to rot.**

Upon intake on 7/5/23, the nurse noted that Plaintiff had a 4 cm laceration with 10 staples and multiple puncture wounds to his anterior left shin.  (Doc. 27-8, at 2.)  Plaintiff had daily wound care starting on 7/6/23, with the exceptions of 7/12, 7/26, 8/1, 8/23, and 8/24/23.  On 7/26/23, an increase in purulent drainage and odor was noted.  Plaintiff denied pain.  (Doc. 27-8, at 3.)  On 7/31/23, the wound was cultured, and Plaintiff was placed in medical isolation for 48 hours.  *Id.* at 3-4.  The medical records note that staff "[c]onsulted w Dr. Tomarchio re culture results.  Original plan was for referral for debridement.  After evaluation, no longer indicate debridement at this time as the wound is healing nicely and wound care will probably be out tomorrow for further evaluation."  (Doc. 27-4, at 1.)  By 8/25/23, there were no signs or symptoms of infection, no pain, no odor, and scant drainage.  (Doc. 27-5, at 22-23.)  The wound bed was red and clean with healthy granulating tissue.  *Id.* at 23.

**8.  He was forced to live in a filthy cell until December, 2023.**

Plaintiff was moved into cell 16 on module 2A on 7/11/23.  He made no complaints or

grievances about the condition of the cell until 10/29/23, when he told his module officer that there was water and mold under his mattress.  He was immediately moved.  (Doc. 27-32, p. 1.)  He next complained about water in his cell on 4/20/24 and was again immediately moved.  *Id.*

**9.  He was unable to shower regularly until December, 2023.**

Plaintiff did not grieve this issue.  He did note in his 8/30/23 grievance that "I use the handicapped shower because I need the railings. . . I have used the shower since I got out of my wheelchair."  (Doc. 27-31, at 1.)

## III.  DISCUSSION

The Court finds that Plaintiff's Complaint is subject to dismissal for the following reasons.

### A.  Problems with Defendants

The M&O found that the Complaint did not allege the personal participation of most of the defendants, improperly made numerous allegations against collective defendants, and did not adequately support his allegation of liability of supervisory or municipal defendants.  (*See* Doc. 7, at 5-9.)  If Plaintiff chooses to file an amended complaint, he should address these issues.

### B.  No Deliberate Indifference to Serious Medical Needs

The United States Supreme Court has held that an inmate advancing a claim of cruel and unusual punishment based on inadequate provision of medical care must establish "deliberate indifference to serious medical needs."  *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Boyett v. County of Washington*, 282 F. App'x 667, 672 (10th Cir. 2008) (citing *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005)).  The "deliberate indifference" standard has two components: "an objective component requiring that the pain or deprivation be sufficiently serious; and a subjective component requiring that [prison] officials act with a sufficiently culpable state of mind."  *Miller*

*v. Glanz*, 948 F.2d 1562, 1569 (10th Cir. 1991); *Martinez v. Garden*, 430 F.3d 1302, 1304 (10th Cir. 2005).

A medical need is sufficiently serious if it is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980); *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999); *Martinez*, 430 F.3d at 1304 (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (quotation omitted)).

In situations where treatment was delayed rather than denied altogether, the Tenth Circuit requires a showing that the inmate suffered "substantial harm" as a result of the delay. *Sealock v. Colorado*, 218 F.3d 1205, 1210 (10th Cir. 2000) (citation omitted). "The substantial harm requirement 'may be satisfied by lifelong handicap, permanent loss, or considerable pain.'" *Mata*, 427 F.3d at 751 (quoting *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001)).

Plaintiff must also satisfy the subjective prong. The Supreme Court has insisted upon actual knowledge: "the official must *both* be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and he must also draw the inference*." *Farmer*, 511 U.S. at 837 (emphasis added). The "negligent failure to provide adequate medical care, even one constituting medical malpractice, does not give rise to a constitutional violation." *Perkins v. Kan. Dep't of Corr.*, 165 F.3d 803, 811 (10th Cir. 1999) (citing *Estelle*, 429 U.S. at 105–06). "A plaintiff 'need not show that a prison official acted or failed to act believing that harm actually would befall an inmate,' but rather that the official 'merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist.'" *Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1137 (10th Cir. 2023) (quoting *Farmer*, 511 U.S. at 842, 843 n.8).

An apparent disagreement over course of treatment or diagnosis, however, does not rise to the level of a constitutional violation. *Gee v. Pacheco*, 627 F.3d 1178, 1192 (10th Cir. 2010); *Dopp v. Larimer*, 731 F. App'x 748, 752 (10th Cir. 2018). "[T]he subjective component is not satisfied, absent an extraordinary degree of neglect, where a doctor merely exercises his considered medical judgment." *Self v. Crum*, 439 F.3d 1227, 1232 (10th Cir. 2006). A difference of opinion between the prison's medical staff and the inmate as to the diagnosis or treatment which the inmate receives does not support a claim of cruel-and-unusual punishment. *See, e.g., Smart v. Villar*, 547 F.2d 112, 114 (10th Cir. 1976); *Self*, 439 F.3d at 1231; *Thompson v. Gibson*, 289 F.3d 1218, 1222 (10th Cir. 2002). "[T]he medical judgment of the physician, even if grossly negligent, is not subject to second-guessing in the guise of an Eighth Amendment claim." *Mata*, 427 F.3d at 751.

The Tenth Circuit recently clarified that "it is possible to have some medical care and still state a claim under the gatekeeper theory." *Lucas*, 58 F.4th at 1139. "The inquiry under a gatekeeper theory is not whether the prison official provided *some* care but rather whether they fulfilled their sole obligation to refer or otherwise afford access to medical personnel capable of evaluating a patient's treatment needs when such an obligation arises." *Id*. (citations omitted). Under the deliberate indifference analysis, "merely doing *something* (with no reference to the underlying condition) does not necessarily insulate one from liability." *Id*. "Instead, a court may need to determine whether there was the functional equivalent of a complete denial of care in light of the specific circumstances." *Id*. (citations omitted).

In *Lamar v. Boyd*, the Tenth Circuit considered a case with facts similar to those at issue here, finding:

> Lamar alleges in his complaint that Defendant Wright violated his constitutional rights by failing to properly diagnose him with a spinal injury. But this allegation amounts to a disagreement of diagnosis that does not rise to the level of a constitutional violation. Even if Wright was negligent in failing to categorize

Lamar's injury as spinal, rather than muscular, such negligence would at most amount to medical malpractice, not an Eighth Amendment violation. *Id.* ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). Nor does Wright's statement that "it's not like you broke your back" rise to the indifference required. While such a comment may be unnecessary, or even unhelpful, it does not demonstrate the "extraordinary degree of neglect" required to assert an Eighth Amendment violation. *Self v. Crum,* 439 F.3d 1227, 1232 (10th Cir. 2006).

*Lamar v. Boyd*, 508 F. App'x 711, 714 (10th Cir. 2013).

The Court finds that Plaintiff's medical records do not show that he received the functional equivalent of a complete denial of care. *See Lucas*, 58 F.4th at 1139. Plaintiff received medical visits shortly after he requested them, was provided with pain medication, received x-rays, CT scans, and an MRI, and was offered and given physical therapy. While Plaintiff clearly believes that something more should or could have been done, that is merely a disagreement with the course of treatment and does not rise to the level of deliberate indifference. *See Taylor v. Ortiz*, 410 F. App'x 76, 79 (10th Cir. 2010) (prisoner who merely disagrees with a diagnosis or a prescribed course of treatment does not state a constitutional violation); *Levy v. Kafka*, 6 App'x 822, 823 (10th Cir. 2001) (affirming dismissal of § 1983 action when the "materials submitted . . . demonstrate[d] the availability of medical care" and the plaintiff merely asserted that "different treatment [was] required to alleviate his pain and suffering").

Plaintiff is given the opportunity to show cause why his claim of deliberate indifference to serious medical needs should not be dismissed.

## C. Retaliation

The Court also finds that Plaintiff's allegations fail to state a claim for retaliation. "[I]t is well established that an act in retaliation for the exercise of a constitutionally protected right is actionable under [42 U.S.C.] Section 1983 even if the act, when taken for a different reason, would

have been proper." *Smith v. Maschner*, 899 F.2d 940, 947 (10th Cir. 1990) (citations omitted).

The Tenth Circuit has held that:

> Government retaliation against a plaintiff for exercising his or her First Amendment rights may be shown by proving the following elements:  (1) that the plaintiff was engaged in constitutionally protected activity; (2) that the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct.

*Shero v. City of Grove*, 510 F.3d 1196, 1203 (10th Cir. 2007).

However, an "inmate claiming retaliation must allege *specific facts* showing retaliation because of the exercise of the prisoner's constitutional rights." *Fogle v. Pierson*, 435 F.3d 1252, 1264 (10th Cir. 2006) (quotations and citations omitted).  Thus, for this type of claim, "it is imperative that plaintiff's pleading be factual and not conclusory.  Mere allegations of constitutional retaliation will not suffice." *Frazier v. Dubois*, 922 F.2d 560, 562 n. 1 (10th Cir. 1990).  "To prevail, a prisoner must show that the challenged actions would not have occurred 'but for' a retaliatory motive." *Baughman v. Saffle*, 24 F. App'x 845, 848 (10th Cir. 2001) (citing *Smith v. Maschner*, 899 F.2d 940, 949–50 (10th Cir. 1990); *Peterson v. Shanks*, 149 F.3d 1140, 1144 (10th Cir. 1998)).

Plaintiff alleges in his Complaint that when he was in isolation under observation upon intake, he expressed repeated complaints about being under 24-hour lockdown and demanded the use of a phone.  (Doc. 1, at 6.)  In retaliation for his complaints, Plaintiff alleges that a deputy was sent to his cell to remove his wheelchair on July 10, 2023. *Id*. at 7.  Plaintiff also alleges that he was written up and locked down when he filed a grievance about the denial of his request to see a spine specialist. *Id*. at 12.  He does not provide the date that this occurred or further details.

The *Martinez* Report disputes Plaintiff's account of the wheelchair removal.  According to the Report, the wheelchair was initially given to Plaintiff because he had blisters on the bottom of his feet.  On 7/8/23, the nurse doing Plaintiff's daily wound care noted that the blisters were healed. Later that day, Plaintiff was asked if he wanted to return the wheelchair to Medical.  According to the jail log, Plaintiff said he would return the wheelchair so he could be removed from Med Seg.

However, even if Plaintiff's account is accepted, he has not stated a claim for retaliation. Plaintiff cannot show that the wheelchair would not have been removed anyway in the absence of a retaliatory motive.  Plaintiff's claim for retaliation is subject to dismissal.

### D.  ADA Claim

Plaintiff's ADA claim alleges that he is "100% disabled" yet "5 days after a brutal attack . . . the Management and Health Provider-Admin took Crump's wheelchair and denied him a walker, cane and access to handicap shower."  (Doc. 1, at 5.)

According to the Report, Plaintiff was given a wheelchair upon intake due to the blisters on the bottom of his feet.  Plaintiff's medical records show that the blisters were healed on July 8, 2023.  Plaintiff voluntarily returned the wheelchair on that date so that he could get off of medical segregation.  Plaintiff then requested a wheelchair for two court appearances, and both requests were granted.  He did submit a complaint about the removal of the wheelchair until October 24, 2023.

Plaintiff first requested a cane on October 21, 2023.  He made repeated requests on October 22, 23, and 24.  Dr. Stanton reviewed his chart on October 24 and determined he did not meet the qualifications for receiving a cane.  Plaintiff continued to make requests on October 27, 28, and 30.  On November 7, 2023, Dr. Stanton approved Plaintiff for a cane and referred him to physical

therapy.  Plaintiff continues to be approved for a cane to the present day.  Further, the Report states that Plaintiff never requested a walker.

As for the handicapped shower, the records show that Plaintiff has been officially approved for use of the handicapped shower since September 1, 2023, and was allowed to use it prior to that date.

The ADA prohibits discrimination by government entities on the basis of disability.  Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  State prisons are within Title II's definition of "public entities." *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 209-10 (1998).

"To state a claim under Title II of the ADA, a plaintiff must allege: (1) he is 'a qualified individual with a disability'; (2) he 'was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities, or was otherwise discriminated against by the public entity'; and (3) 'such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability.'" *Crane v. Utah Dept. of Corrections*, 15 F.4th 1296, 1312 (10th Cir. 2021) (quoting *J.V. v. Albuquerque Pub. Sch.*, 813 F.3d 1289, 1295 (10th Cir. 2016)).  The inability to prove any one of these elements precludes an ADA claim.  *Id.*  "Courts have recognized three ways to establish a discrimination claim: (1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation." *J.V. v. Albuquerque Pub. Sch.*, 813 F.3d 1289, 1295 (10th Cir. 2016).

Plaintiff alleges failure to make a reasonable accommodation, but his allegations are not supported by the records.  Plaintiff's ADA claim is subject to dismissal.

### IV.  Response and/or Amended Complaint Required

The *Martinez* report developed as a means "to ascertain whether there is a factual as well as a legal basis for [a] prisoner's claims." *Gee v. Estes*, 829 F.2d 1005, 1007 (10th Cir. 1987).  The report "is treated like an affidavit, and the court is not authorized to accept the factual findings of the prison investigation when the plaintiff has presented conflicting evidence." *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991) (citing *Sampley v. Ruettgers*, 704 F.2d 491, 493 n. 3 (10th Cir. 1983)).  Thus, at this point in the proceedings the Court does not use the Report to resolve conflicts of fact.  *See Swoboda v. Duback*, 992 F.2d 286, 290 (10th Cir. 1993) ("In determining whether a plaintiff has stated a claim, the district court may not look to the Martinez report, or any other pleading outside the complaint itself, to refute facts specifically pled by a plaintiff, or to resolve factual disputes.").

In light of the Report, the Court is considering dismissal of this matter for failure to state a claim.  Plaintiff will be given an opportunity to respond to the Report and to show good cause why dismissal should not be entered.  Plaintiff is also given the opportunity to file a complete and proper amended complaint that cures the deficiencies discussed herein.

To add claims, significant factual allegations, or change defendants, a plaintiff must submit a complete amended complaint.  *See* Fed. R. Civ. P. 15.  An amended complaint is not simply an addendum to the original complaint, and instead completely supersedes it.  Therefore, any claims or allegations not included in the amended complaint are no longer before the Court.  It follows that a plaintiff may not simply refer to an earlier pleading, and the amended complaint must contain all allegations and claims that a plaintiff intends to pursue in the action, including those to be retained from the original complaint.  Plaintiff must write the number of this case (24-3036-JWL)

at the top of the first page of his amended complaint, and he must name every defendant in the caption of the amended complaint.  *See* Fed. R. Civ. P. 10(a).

If Plaintiff does not file an amended complaint within the prescribed time that cures all the deficiencies discussed herein, this matter will be decided based upon the current deficient Complaint and may be dismissed without further notice for failure to state a claim.

## V.  Motions

Also before the Court are two motions filed by Plaintiff.  The first is titled "Motion to Compel Martinez Report" (Doc. 32), filed on July 8, 2024.  Plaintiff asserts that the Report was due on June 11, 2024, and he has not received it.  He asks the Court to impose sanctions on the JCADC.

Defendants filed a response (Doc. 34) to the motion, certifying that the Report and exhibits were mailed to Plaintiff on June 10, 2024, with the exception of one exhibit which was mailed on June 28, 2024.  Defendants certify that they re-mailed the documents to Plaintiff on July 15, 2024.

Plaintiff's motion is not dated, but the envelope has a postmark of June 14, 2024.  It seems likely that this is a case of delayed mail and that Plaintiff has received the Report and exhibits since he mailed his motion.  The motion is denied.

The second motion filed by Plaintiff is titled "Motion to Join Claims" (Doc. 33).  Plaintiff seeks to join the claims he brought in Case Nos. 24-CV-3089-JWL and Case No. 24-CV-3098-JWL with his claims in this action.  The Court in those cases, as well as in Case No. 24-CV-3076, found that some or all of Plaintiff's claims were duplicative of his claims here and stated that "all claims of inadequate medical care at the JCADC related to Plaintiff's back injury and his treatment for that condition should be brought in case number 24-3036-JWL."  *See Crump v. Vital Core Health Strategies, LLC, et al*., Case No. 24-CV-3089-JWL, Doc. 7, at 8; *Crump v. Vital Core*

*Health Strategies, LLC, et al.*, Case No. 24-CV-3098-JWL, Doc. 4, at 7; *Crump v. Clemens, et al.*, Case No. 24-CV-3076-JWL, Doc. 6, at 6.

Therefore, Plaintiff's motion is granted.  He is directed to include all of his claims of inadequate medical care at the JCADC in any amended complaint he may file in this action.


**IT IS THEREFORE ORDERED** that Plaintiff is granted until **August 16, 2024,** in which to respond to the *Martinez* Report and to show good cause why this action should not be dismissed.

**IT IS FURTHER ORDERED** that Plaintiff is granted until **August 16, 2024,** in which to file a complete and proper amended complaint to cure all the deficiencies discussed herein.

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Compel Martinez Report (Doc. 32) is **denied as moot**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Join Claims (Doc. 33) is **granted**. Plaintiff shall include in any amended complaint filed in response to this Order all claims of inadequate medical care at the JCADC.


The clerk is directed to send § 1983 forms and instructions to Plaintiff.


**IT IS SO ORDERED.**

**Dated July 16, 2024, in Kansas City, Kansas.**


**S/   John W. Lungstrum**
**JOHN W. LUNGSTRUM**
**UNITED STATES DISTRICT JUDGE**